UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| REBECCA FLUGSTAD, and BENJAMIN FLUGSTAD,<br><br>      Plaintiffs,<br><br>  v.<br><br>UNITED STATES OF AMERICA, DEPARTMENT OF THE INTERIOR, U.S. FISH and WILDLIFE SERVICE, LAEL SWANSON and JOHN DOE SWANSON, and the marital community composed thereof,<br><br>      Defendant. | CASE NO. 13-5192 RJB<br><br>ORDER ON UNITED STATES' MOTION TO DISMISS |

This matter comes before the Court on the United States' Motion to Dismiss. Dkt. 20. The Court has considered the pleadings filed in support of and in opposition to the motion, and the file herein.

On March 14, 2013, Plaintiff filed this case asserting a negligence claim against the United States and others stemming from an injury Mrs. Flugstad suffered when she was startled by a horse and fell from a trial in the Dungeness National Wildlife Refuge ("Dungeness" or "the

refuge"). Dkt. 1. Now ripe is the United States' Motion to Dismiss, where it asserts that this Court lacks subject matter jurisdiction over Plaintiffs' claim against it because of the discretionary function exception to Federal Tort Claims Act ("FTCA") liability, found at 28 U.S.C. § 2680(a). Dkt. 20. For the reasons set forth below, the discretionary function exception applies and the Plaintiffs' negligence claim against the United States should be dismissed.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

### A. BACKGROUND FACTS ON DUNGENESS

Dungeness was established by Woodrow Wilson in an Executive Order in 1915, for the purpose of creating " . . . a refuge, preserve, and breeding ground for native birds . . ." Dkt. 20-3, at 14. It is situated on the northern coast of Washington's Olympic Peninsula along the Strait of Juan de Fuca. Dkt. 20-3. Dungeness encompasses 773 acres and contains Dungeness spit, the longest natural sand spit in the United States, as well as tidelands and upland forest habitat. Dkt. 20-4, at 1. It has diverse ecosystems, and is home to thousands of bird, animal, and plant species. *Id.*

Dungeness is managed by the United States Fish and Wildlife Service and is a part of the National Wildlife Refuge System. Dkt. 20-3. The mission of the National Wildlife Refuge System "is to administer a national network of lands and waters for the conservation, management, and where appropriate, restoration of the fish, wildlife, and plant resources and their habitats within the United States for the benefit of present and future generations of Americans." 16 U.S.C. § 668dd(a)(2). In administering the System, the Secretary of the Interior is instructed, in part, to "ensure that the mission of the System . . . and the purposes of each refuge are carried out;""plan and direct the continued growth of the System in a manner that is best designed to accomplish the mission of the System;" and to "recognize compatible wildlife

dependant recreational uses as the priority general public uses of the System through which the American public can develop an appreciation for fish and wildlife." *Id*. at § 668dd(a)(4)(A), (C) and (H). The Secretary of the Interior is authorized to prescribe regulations to "permit the use of any area within the System, for any purpose, including but not limited to hunting, fishing, public recreation, and accommodation and access whenever he determines that such uses are compatible with the major purposes for which such areas were established." *Id*. at § 668dd(d)(1)(A).

Some of the recreational uses that are permitted in Dungeness are hiking and horseback riding. Dkt. 20-3. To that end, there are two trails that cross some 74 acres of forested uplands in the refuge. Dkt. 22, at 1. The main trail starts at the parking lot, leads visitors to a lookout point, and then onto the beach where visitors can hike the Dungeness Spit to the lighthouse. Dkt. 22, at 1-2. The upper portion of the main trail is between 8 to 10 feet wide to the lookout point, and is wheelchair accessible. *Id.* The primitive trail is an unpaved dirt trial around 3 to 4 feet wide. *Id.* It loosely parallels the main trial and joins the main trail at the lookout point. *Id*. From there (the last 500 feet or so) of the joined trails to the beach is about ten feet wide but is rather steep, and is not wheelchair accessible. *Id.* On this lower portion of the trail, there are wooden erosion control walls in some areas on the upslope side of the trial, and some retaining sections on the downslope side. *Id.* Hikers and horseback riders share the lower portion of the trail. *Id.*

**B. VISITOR ENHANCEMENT AND TRIALHEAD PROJECT AND TRAIL RECONSTRUCTION PROJECT AT DUNGENESS**

In 2010, an improvement project was initiated by the Fish and Wildlife Service for Dungeness, which included the Visitor Enhancement and Trailhead Project, for the construction

of a 3,000 square foot visitor information area, and a Trail Reconstruction Project. Dkt. 30, at 2. Both projects were part of the same contract. *Id.*

As a result, in 2011, the trails in Dungeness were reconstructed by a private contractor, P.F. Pepiot, based on a design by another private contractor, Walker Macy. Dkt. 21, at 1. Fish and Wildlife Service Landscape Architect, Elizabeth Ludvigsen, was the contracting officer's representative, and was responsible for administering the contract with the private entities. Dkt. 21, at 1. There were two objectives in the Trail Reconstruction Project. Dkt. 21, at 2. The first was to make the upper portion of the trail handicap accessible. *Id.* The second objective related to the lower portion of the trial and was to 1) repair erosion damage, 2) clean drainage ditch and pipes, 3) rehabilitate the trail surface, and 4) install new and reconstruct existing retaining walls on the inslope. *Id.* Project specifications call for the contractor to build a "firm durable, permeable tread surface for the trailhead and the trail." Dkt. 27, at 37. In some areas of the lower trail, vegetation was used to maintain the integrity of the trial. Dkt. 27, at 40. In other areas, particularly where it is very steep and there was little vegetation to stop erosion, the trail contained "footboards" on the edge. Dkt. 27, at 40. These footboards existed prior to the rehabilitation of the trail. Dkt. 30, at 4. No new footboards were included in the contract for the trail. *Id.*

### C. MRS. FLUGSTAD FALLS OFF THE HIKING TRAIL IN 2012

On May 6, 2012, Plaintiffs Mr. and Mrs. Flugstad were hiking up the lower portion of the refuge's trial from the beach. Dkt. 27, at 9. Three horseback riders were dismounted and leading their horses up the trial behind the Flugstads. Dkt. 27, at 11-12. Mrs. Flugstad testified that as the horses overtook them on the trail, she noticed that the lead horse appeared anxious. *Id.,* at 16. Defendant Lael Swanson was leading this horse. Dkt. 1. Mrs. Flugstad became

fearful of the horse, and so stepped off the trial onto the soft downslope edge. *Id.,* at 17. A witness on the beach, Jeffrey Pearson, testified that he was watching and when Mrs. Flugstad stepped off the trail, saw her ankle roll and then she fell. Dkt. 27, at 24. One of the horseback riders, Amanda White, testified that she saw Mrs. Flugstad, who was "very close to the edge," take a step back, stumble, grab a branch, and then the ground gave way beneath her. Dkt. 27, at 28-29. In any event, Ms. Flugstad fell about 20 feet. Dkt. 1, at 4. She landed on a log, fractured her C6 vertebra and seriously injured her spine. Dkt. 1, at 4. There was no footboard along the edge of the trail where Ms. Flugstad fell, but there was significant vegetation. Dkt. 27, at 29 and 40.

### D. PROCEDURAL HISTORY

Plaintiffs filed this case against the United States and Lael Swanson on March 14, 2013. Dkt. 1. In it, Plaintiffs contend that the United States was negligent in failing to protect the safety of visitors, "including taking reasonable steps to protect the safety of pedestrians in the vicinity of horses," and failing to design, construct, and maintain the refugee's trail in a safe manner. Dkt. 1, at 5. Plaintiffs also make a negligence claim against Ms. Swanson for failing to exercise ordinary care while "operating a horse." *Id.*, at 5. Plaintiffs seek damages against both Defendants. *Id*.

### E. PENDING MOTION

The United States now moves to dismiss Plaintiffs' negligence claim, arguing that it is immune from suit under the discretionary function exception to the FTCA. Dkts. 20, and 29. The United States here argues that there was no federal statute, regulation, or administrative policy that mandated 1) what uses (including horseback riding) be allowed in Dungeness, 2) which safety hazards are to be identified and mitigated on the trials in Dungeness, or 3) or how

1 to achieve all the objectives of the trail reconstruction, and so the challenged actions involved

2 exercise of judgment. *Id*. It further argues that the decisions related to actions were susceptible

3 to, and were based on, social, economic, and political policy considerations. *Id.* The United

4 States argues, accordingly, that all these decisions were discretionary, and so Plaintiffs' claim

5 against it should be dismissed. *Id*.

Plaintiffs oppose the motion, but acknowledge that they are not now challenging the "well settled issues" of appropriate use determinations (like allowing horseback riding), safety hazard analysis of the trial, or project design considerations. Dkt. 26, at 8.

Accordingly, to the extent the Complaint makes claims based on those theories, the discretionary function exception applies and Plaintiff's negligence claim against the United States on those issues should be dismissed.

Plaintiff argues, instead, that it is the government's negligent implementation of the trail rehabilitation project and failure to maintain improvements on federal land that subject it to the jurisdiction of this Court. Dkt. 26.

## II. DISCUSSION

### A. STANDARD FOR MOTION TO DISMISS

A complaint must be dismissed under Fed. R. Civ. P. 12(b)(1) if, considering the factual allegations in the light most favorable to the plaintiff, the action: (1) does not arise under the Constitution, laws, or treaties of the United States, or does not fall within one of the other enumerated categories of Article III, Section 2, of the Constitution; (2) is not a case or controversy within the meaning of the Constitution; or (3) is not one described by any jurisdictional statute. *Baker v. Carr*, 369 U.S. 186, 198 (1962); *D.G. Rung Indus., Inc. v. Tinnerman*, 626 F.Supp. 1062, 1063 (W.D. Wash. 1986); *see* 28 U.S.C. §§ 1331 (federal

question jurisdiction) and § 1346 (United States as a defendant). When considering a motion to dismiss pursuant to Rule 12(b)(1), the court is not restricted to the face of the pleadings, but may review any evidence to resolve factual disputes concerning the existence of jurisdiction. *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988), *cert. denied*, 489 U.S. 1052 (1989); *Biotics Research Corp. v. Heckler*, 710 F.2d 1375, 1379 (9th Cir. 1983).

### B. FTCA AND THE DISCRETIONARY FUNCTION EXCEPTION

The United States, as sovereign, is immune from suit unless it consents to be sued. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980); *Cato v. United States*, 70 F.3d 1103, 1107 (9th Cir. 1995). The FTCA is a limited waiver of sovereign immunity, rendering the United States liable for certain torts of federal employees. *See* 28 U.S.C. § 1346(b). The FTCA provides,

> Subject to the provisions of chapter 171 of this title, the district courts, . . ., shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

Among the exceptions to the FTCA waiver of sovereign immunity is the "discretionary function exception." It excludes:

> Any [§ 1346] claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). "The discretionary function exception insulates certain governmental decision-making from judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Myers v. U.S.*, 652 F.3d 1021, 1028 (9th Cir. 2011)(*internal citations omitted*). "The government bears the burden of proving that the discretionary function exception applies." *Id.* Additionally, "[t]he FTCA was created by Congress with the intent to compensate individuals harmed by government negligence, and as a remedial statute, it should be construed liberally, and its exceptions should be read narrowly." *Terbush v. United States*, 516 F.3d 1125, 1135 (9th Cir. 2008).

A two step test is used to determine whether the discretionary function applies. *Terbush*, at 1129 (*citing Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)). In the first step, the court determines "whether challenged actions involve an element of judgment or choice." *Id.* (*quoting Berkovitz*, at 536). If the challenged actions do involve an element of judgment or choice, then the court turns to the second step in the test. *Id.* The second step requires the court to decide "'whether that judgment is of the kind that the discretionary function exception was designed to shield,' namely, 'only governmental actions and decisions based on considerations of public policy.'" *Terbush,* at 1130 (*quoting Berkovitz*, at 536-37). The exception applies even if the decision is an abuse of discretion. *Id.* Each of the steps will be examined below.

          1. <u>Whether Challenged Actions Involved an Element of Judgment?</u>

In the first step, the court determines "whether challenged actions involve an element of judgment or choice." *Terbush,* at 1130 (*quoting Berkovitz*, at 536-37). Under this step, the "nature of the conduct, rather than the status of the actor" is examined. *Id.* "The discretionary element is not met where 'a federal statute, regulation, or policy specifically prescribes a course

of action for an employee to follow.'" *Id.* (*quoting Berkovitz*, 486 U.S. at 536). The inquiry ends if there is such a statute or policy directing mandatory and specific action because there can be no element of discretion when an employee "has no rightful option but to adhere to the directive." *Id*.

The United States has carried its burden and shown that the challenged decisions here involve an "element of judgment or choice" because they relate to the design of the trail. The Plaintiffs argue that where the government establishes contractual standards and reserves to itself the right to inspect work being performed on its behalf, it may create duties which the government has no discretion to disregard. Dkt. 26 (*citing Kennewick Irrigation Dist. v. U.S.*, 880 F.2d 1018, 1030 (9th Cir. 1989) and *Camozzi v. Roland/Miller and Hope Consulting Group,* 866 F.2d 287 (9th Cir.1989)). Plaintiffs argue that the Fish and Wildlife Service here (through the contractors) failed to construct the trail in conformance with contract requirements and so disregarded mandatory duties in the reconstruction of the trail surface. Dkt. 26. Plaintiffs point out that in the "Statement of Work" for the trail rehabilitation project, the trail was to have a "firm[,] durable, permeable tread surface," that the contract specifications require that the "crushed basalt surfacing for the trail 'shall have a smooth, tight, uniform surface true to line, grade, and cross-section indicated on the Drawings'" and that the referenced "Drawings" "show the trail cross section with edges supported by tapered shoulders having a 3:1 horizontal-to-vertical slope." Dkt. 26, at 11-12. Plaintiffs then argue that the "evidence shows that the lower trail where the incident occurred did not conform to the firm and durable requirement and lacked adequate support of the trail edges." Dkt. 26, at 12. Plaintiffs note that footboards, which they assert are used to support the trail surface, end just above where she fell. Dkt. 26, at 13.

It is undisputed that Ms. Flugstad stepped off the trail before she fell.  Although Ms. Flugstad does not testify where she was on the trail when she fell, she testified that:

> The horse was right there.  I felt that I needed to make another step to be out of the way, because really – at that point I was afraid of the first horse.  A hoof meant blood; blood meant problems.  I took the step, believing that I took it and that action would have put me out of the danger of the horse.  And the next thing I know, I was in the air. . . . I realized I was free falling – this was not rolling down the hill; this was free falling through the air.

Dkt. 27, at 17.  Mr. Flugstad stated that Ms. Flugstad stepped into the dirt area to avoid the horse, but not all the way into the vegetation.  Dkt. 27, at 21.  The witness on the beach, Mr. Pearson testified that she was off the hard surface of the trail, onto the "dirt surface" right next to the weeds when he saw her "ankle roll and then she fell."  Dkt. 27, at 24-25.  Ms. White, another horseback rider who was coming up behind Ms. Flugstad, testified that she saw her "very close to the edge" already on the dirt shoulder when Ms. Flugstad stepped back again to avoid the horse.  Dkt. 27, at 28-29.  Ms. White states that "[s]he was on the shoulder, took the step which again, like I said, was on the edge and then it started to give, she grabbed a branch, caught herself, and then the ground gave way."  Dkt. 27, at 29.  Ms. White stated that she felt that Ms. Flugstad "probably" stepped into the vegetation with her last step.  Dkt. 27, at 29.  Accordingly, her claims regarding the trail surface are not helpful to her because she was not on the trail surface when she fell.

Further, the United States properly points out that neither the Contract nor the Statement of Work require the use of footboards on the lower portion of the trail.  Dkt. 29.  Design of the trial included the use of vegetation as trial support in some areas in order to maintain a firm and durable trail surface.  Footboards existed on the trail in some areas before the renovation, but were not added.  The United States has shown that footboards were not installed not because of a

contract or inspection violation, but because they were not a part of the trail design. Plaintiffs concede that trail design decisions are protected by the discretionary function exception.

Plaintiffs also argue that the trail failed to conform with the construction standards incorporated into the contract, including the Architectural Barriers Act Accessibility Standard 2006 ("ABAAS") because the trail surface was not "firm and stable" and the International Building Code ("IBC") because there should have been a guard rail on the trail. Dkt. 26, at 13-14.

On the outset, the United States points out that the portion of the contract which references the ABAAS and IBC related to the Visitor Enhancement and Trailhead Project and not the Trail Reconstruction Project. Dkt. 29. (The Visitor Enhancement and Trailhead Project involved the construction of a visitor shelter, kiosk and fee station and are buildings under these codes.) It points out that the provisions are not applicable to this case because the event happened on the lower portion of the trial. Further, as it relates to the ABAAS, it is undisputed that Mrs. Flugstad moved off the trail surface before she fell. Moreover, the United States properly points out that the IBC by its terms does not apply to trails. *See e.g*. IBC 101.2 (provisions of this code shall apply to the construction, alteration, movement, enlargement, replacement, repair . . . of every building or structure). These codes do not provide a source of mandatory action for the Fish and Wildlife Service.

The decision to omit footboards and guard rails on the lower portion of the trail were discretionary decisions related to trail design. Plaintiff acknowledges that design decisions are excluded by the discretionary function exaction.

Plaintiffs also argue that the government failed to inspect the trail to ensure that it complied with the contract and failed to maintain the trail. Dkt. 26, at 16.

These arguments are likewise not helpful to Plaintiffs. Plaintiffs fail to show that the contractor committed a safety violation that the government failed to detect and that resulted in her injuries. Plaintiffs have not shown that the trail was constructed in a manner which violated the contract. Moreover, Plaintiffs fail to point to any specific maintenance issues.

Plaintiffs do not provide a mandatory directive in regard to the trail that officials did not follow here. The design decisions here involved an element of judgment and choice – the exercise of discretion. Accordingly, there being no statute or policy directing mandatory and specific action, the Court must continue to the second step of the discretionary function exception analysis. *Myers,* at 1028.

### 2. Whether the Judgment is of the Kind that the Discretionary Function Exception was Designed to Shield – Decisions Based on Considerations of Public Policy?

The second step requires the court to decide "'whether that judgment is of the kind that the discretionary function exception was designed to shield,' namely, 'only governmental actions and decisions based on considerations of public policy.'" *Terbush,* at 1130 (*quoting Berkovitz*, at 536-37.) In this context, public policy has been understood to include decisions "grounded in social, economic, or political policy." *Terbush,* at 1130 (*quoting Varig*, at 814).

The government's decision here to omit footboards and guard rails along the lower portion of the trail is susceptible to policy analysis because in deciding whether to use these devices, they had to balance the goals and mandates regarding the refuge with public access to the refuge. Ms. Ludvigsen stated that she did not use footboards or guard rails in this portion of the trail for several reasons noting:

> This trail would be defined as a roaded-natural trail within the Recreational Opportunity Spectrum ("ROS"). We are tasked with maintaining the trail and surrounding area in the DNWR as a predominately natural appearing environment. The facilities should harmonize with the natural environment.

ORDER ON UNITED STATES' MOTION TO
DISMISS- 12

> Unnecessary footboards and guards are inappropriate in this setting. As I noted in my prior declaration, in deciding how best to design the trail at the DNWR to achieve the goals we were trying to accomplish, I had to ensure that the natural resources were being conserved, the environment and wildlife species in the refuge were being preserved, and the natural terrain and panoramic views were being preserved. I also had to take into account and consider the particular recreational setting for the Refuge, and the recreational setting for each portion of the trail I was working on. At the same time, I had to consider and provide for visitor expectation, enjoyment, and safety. Finally, all of these decisions had to be made within the financial and budgetary constraints of the FWS at that time.

Dkt. 30, at 5.

Plaintiffs argue that while the design of the trail is protected by the discretionary function exception, the implementation of that design was not protected. Dkt. 26. Plaintiffs, however, do not point out a failure in the implementation of the trail design. Moreover, Plaintiffs citation to *Whisnant v. United States*, 400 F.3d 1177 (9th Cir. 2005), is unhelpful. *Id*.

In *Whisnant*, the plaintiff worked in the commissary at the U.S. Naval base in Bremerton, Washington. 400 F.3d at 1179. He brought suit against the United States for negligence under the FTCA for injuries he sustained as a result of the government's failure to clean up toxic mold which had accumulated at the commissary. *Id.* In rejecting the government's argument that the decision not to clean up the mold was grounded in social, economic or political considerations, the Ninth Circuit found, that "matters of scientific and professional judgment-particularly judgments concerning safety-are rarely considered to be susceptible to social, economic, or political policy," and that the failure to clean up mold there was a scientific and professional judgment. *Whisnant*, at 1181. It held that the "decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not.... [S]afety measures, once undertaken, cannot be shortchanged in the name of policy." *Id.,* at 1182 (*internal quotation omitted*). In acknowledging that the difficulty in distinguishing between what governmental decisions regarding safety are based in social, economic, and political policy and

those that are not, the *Whisnant* Court reviewed other FTCA cases where safety had been an issue. *Id*. "[I]n a suit alleging government negligence in the design and maintenance of a national park road, we held that designing the road without guardrails was a choice grounded in policy considerations and was therefore shielded under the discretionary function exception, but maintaining the road was a safety responsibility not susceptible to policy analysis." *Id.*, at 1181-1182 (*citing ARA Leisure Servs. v. United States*, 831 F.2d 193, 195 (9th Cir.1987)).

The government has shown that decisions related to design of the trail implicated policy concerns. Plaintiffs fail to show that the government did not adequately maintain the trail or failed to properly implement a safety measure it had undertaken. Although in retrospect one can conclude that footboards and/or a guard rail might be a good idea in that area of the trial, "that is the sort of judicial second guessing of government decision-making that the discretionary function exception was designed to protect." *Bailey v. United States,* 623 F.3d 855, 863 (9th Cir. 2010).

### 3. Conclusion on Discretionary Function Exception Analysis

United States' motion to dismiss (Dkt. 20) should be granted. Defendant United States is immunized from Plaintiffs' negligence claim based on the discretionary function exception. Plaintiffs' negligence claim against the United States should be dismissed.

Congress has given the Fish and Wildlife Service a safe harbor in the discretionary function exception to a FTCA claim, even if "the discretion involved be abused." 28 U.S.C. § 2680(a).

### C. REMAINING STATE LAW CLAIM

Plaintiffs' remaining claim is a claim for negligence against Lael Swanson and John Doe Swanson, whom the Complaint alleges are residents of the State of Washington. Dkt. 1, at 2. Plaintiffs are also alleged to be residents of Washington. *Id.*

Pursuant to 28 U.S.C. § 1367(c), district courts may decline to exercise supplemental jurisdiction over a state law claim if (1) the claim raises novel or complex issues of state law, (2) the state claim substantially predominates over the claims of which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. "While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the values of economy, convenience, fairness, and comity." *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997)(*internal citations omitted*).

Here, all of the third condition in § 1367(c) has been met. All claims over which this Court had original jurisdiction have been dismissed. The remaining claim is a state law claim against non-diverse defendants. Moreover, the remaining state claims "raise novel or complex issues of state law" under § 1367(c)(1). These are determinations for which the state court is uniquely suited. Accordingly, the values of economy, convenience, fairness and comity may well be served by this Court's declining to exercise supplemental jurisdiction. *See Acri* at 1001.

Although "it is generally within a district court's discretion either to retain jurisdiction to adjudicate the pendent state claims or to remand them to state court," *Harrell v. 20th Ins. Co.*, 934 F.2d 203, 205 (9th Cir. 1991) in the interest of fairness, the parties should be given an opportunity to be heard on whether the remaining claim should be dismissed without prejudice. Parties should be ordered to show cause, if any they have, why the Court should not decline to exercise supplemental jurisdiction and dismiss the remaining state law claim without prejudice. Parties' briefs, if any, are due January 10, 2014. Parties briefs should not exceed three pages.

Consideration of the parties' responses to the Order to Show Cause should be noted for January 10, 2014.

### III. ORDER

Therefore, it is hereby **ORDERED** that:

- The United States' Motion to Dismiss (Dkt. 20) is **GRANTED;**
- Plaintiffs, negligence claim against the United States is **DISMISSED;**
- Parties are **ORDERED TO SHOW CAUSE**, if any they have, why the Court should not decline to exercise supplemental jurisdiction and dismiss the remaining state law claim without prejudice;
- Parties' briefs, if any, are due **January 10, 2014**; and
- Consideration of the parties' responses to the Order to Show Cause **IS NOTED** for **January 10, 2014**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 31st day of December, 2013.

*/s/ Robert J. Bryan*

ROBERT J. BRYAN
United States District Judge